IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN E. COMAN, JR., *Plaintiff*, v. ACA COMPLIANCE GROUP, *Defendant*. | Civil Action No. 2:21-cv-976<br><br>Hon. William S. Stickman IV |

### MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff John E. Coman, Jr. ("Coman") filed this employment discrimination suit against Defendant ACA Compliance Group ("ACA") in the Court of Common Pleas of Allegheny County, Pennsylvania. Specifically, Coman alleges that ACA, his former employer, discriminated against him on the basis of race (Count I) and sex (Count II) and retaliated against him (Count III), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (ECF No. 1-2, ¶¶ 34–59). He also asserts that ACA's discriminatory practices violated the Pennsylvania Human Relations Act ("PHRA") (Count IV). (ECF No. 1-2, ¶¶ 60–66). ACA removed the case to this Court on the basis of federal-question jurisdiction. *See* 28 U.S.C. §§ 1331, 1441; *see also* 42 U.S.C. § 2000e-5(f)(3).[1] ACA then filed a Motion to Dismiss, arguing that Coman failed to exhaust administrative remedies for his race discrimination claims and that he previously released all claims against ACA through a settlement agreement. (ECF No. 7). With respect to whether Coman exhausted his claims, the Court denied ACA's motion. (ECF No. 16). But with respect to whether the claims were released through a settlement

---

[1] The Court exercises supplemental jurisdiction over the PHRA claim. *See* 28 U.S.C. § 1367(a).

1

agreement, which depended on material outside the pleadings, the Court converted ACA's Motion to Dismiss to a Motion for Summary Judgment. (*Id.*). *See* Fed. R. Civ. P. 12(d), 56. Thereafter, the parties engaged in limited discovery with respect to the alleged settlement agreement. At the close of discovery, the parties filed amended summary judgment briefing and supporting documentation. Upon careful review, the Court will deny ACA's Motion for Summary Judgment (ECF No. 24) for the reasons below.

## I. BACKGROUND

Coman, a white male, alleges that his former employer ACA violated Title VII and the PHRA by discriminating against him on the basis of race and sex and retaliating against him after he made complaints to Human Resources. (ECF No. 1-2). According to Coman, such discrimination occurred in the spring of 2020—primarily involving harassment by his white female supervisor—and on May 15, 2020, he was ultimately forced to resign. (*Id.* ¶¶ 11–32). Two months later, on July 14, 2020, Coman filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (ECF No. 8-1). The EEOC assigned an investigator to the case, and that investigator communicated with the parties via email and telephone between January and March 2021. Those communications, detailed below, form the underpinning of ACA's assertion that Coman agreed to settle his claims. Notably, ACA and Coman never spoke directly with each other; rather, they spoke only with the investigator, who acted as an intermediary between the two.

On January 11, 2021, the investigator contacted Coman by email. (ECF No. 27-2, pp. 35–36). She introduced herself and stated that she "would like to discuss [her] findings" with Coman during a "phone interview." (*Id.*). After a brief back-and-forth, Coman and the

investigator agreed to speak by telephone on January 12, 2021, at 4:00 p.m. (*Id.* at 34–35). This phone call apparently took place, but the record does not reveal the length of the call or what was discussed. About half an hour after the scheduled call on January 12, the investigator initiated an email communication with ACA, writing, "Please advise [if ACA is] willing to enter into negotiations to settle this case." (*Id.* at 14). ACA responded about an hour later and stated that it was "confident that there [was] no basis for Mr. Coman's claim," but that it "would be willing to have a discussion about settlement of this claim for nuisance value." (*Id.* at 13). The next morning, on January 13, 2021, the investigator emailed ACA with an "[o]pening demand."[2] (*Id.* at 12–13). But according to Coman, he had never discussed any "monetary amount" with the investigator prior to January 15, 2021 (described below). (ECF No. 27-1, ¶¶ 6–7). Coman is thus "at a loss" regarding the investigator's "authority" for making such a demand upon ACA. (ECF No. 28, p. 2).

Unaware of the investigator's apparent lack of authority, ACA responded to the investigator later in the morning on January 13, writing, "ACA is agreeable to the [redacted] settlement demand subject to signing a settlement agreement with a release of all claims and confidentiality." (ECF No. 27-2, pp. 11–12). Two days later, on January 15, 2021, the investigator turned back to Coman. She wrote that ACA had "agreed to settle this case for a nominal fee of [redacted]" and asked Coman to advise if he would "accept or decline the offer." (*Id.* at 32–33). Coman responded on January 18, 2021, stating, "I have discussed the situation with family and friends and everyone thinks that this nominal amount is woefully inadequate considering the damage that has been done to my career by their unlawful action." (*Id.* at 32). He then expressed his belief that it would be reasonable for ACA to reimburse "some of the

---

[2] The parties have elected to redact all monetary amounts discussed during settlement negotiations.

expenses that [he] incurred in order to shift careers to a different path," and he provided a chart detailing such expenses. (*Id.*).

The investigator, however, did not immediately present Coman's demand to ACA. On January 22, 2021—having not heard anything since January 13—ACA emailed the investigator to "check on next steps." (*Id.* at 11). The investigator did not respond until January 28, 2021, at which time she sent a confusing sequence of overlapping emails to ACA, and, separately, to Coman:

| Emails Between Investigator and ACA on January 28, 2021 | Emails Between Investigator and Coman on January 28, 2021 |
|---|---|
| **4:44 p.m. (From Investigator)**<br><br>What is your decision?<br><br>Will you accept [redacted] or do you want the NRTS [(Notice of Right to Sue)] for court.<br><br>(ECF No. 27-2, p. 10). | |
| **5:17 p.m. (From ACA)**<br><br>I wrote back saying we are agreeable to the [redacted] on January 13th . . . .<br><br>(ECF No. 27-2, p. 9). | |
| **5:22 p.m. (From Investigator)**<br><br>Sorry, I was waiting for a response from [Coman].<br><br>We will be issuing a NRTS.<br><br>(ECF No. 27-2, p. 8). | **5:22 p.m. (From Investigator)**<br><br>We will be issuing the NRTS.<br><br>(ECF No. 27-2, p. 31). |
| **5:23 p.m. (From ACA)**<br><br>Ok so [Coman] is not willing to settle?<br><br>(ECF No. 27-2, pp. 7–8). | |

4

| | |
|---|---|
| **5:25 p.m. (From Investigator)**<br><br>I presented the [redacted] and he decided to raise the offer to [redacted].<br><br>(ECF No. 27-2, p. 7). | |
| | **5:39 p.m. (From Coman)**<br><br>That is fine. My address has changed since I filed the complaint. . . .<br><br>(ECF No. 27-2, pp. 30–31). |
| **6:43 p.m. (From ACA)**<br><br>This is frustrating. We understood [redacted] as [Coman's] initial settlement demand, and we accepted that offer. We don't believe [Coman] is negotiating in good faith if he is trying to increase the demand after we've already accepted. [Redacted] far exceeds the value of this matter. We remain willing to settle the case for [Coman's] initial offer of [redacted].<br><br>(ECF No. 27-2, p. 6). | |

The emails continued the following day, on January 29, 2021:

| **Emails Between Investigator and ACA on January 29, 2021** | **Emails Between Investigator and Coman on January 29, 2021** |
|---|---|
| **8:07 a.m. (From Investigator)**<br><br>[Coman] said after he talked to his family he feels that is too low and here is his breakdown:<br><br>[*Copying Coman's January 18, 2021, email*]<br><br>(ECF No. 27-2, p. 5). | |
| **12:09 p.m. (From ACA)**<br><br>We are still frustrated that [Coman] reneged on the agreed amount, and we | |

| | |
|---|---|
| fundamentally disagree with the notion that school tuition and moving expenses are recoverable in a discrimination claim. As noted in our response letter, we are also very confident that there is no basis for [Coman's] claim. Regardless, I have obtained authority to meet [Coman] in the middle, and **pay [redacted] in full and final settlement of his claim, subject to signing a settlement agreement with a release of all claims and confidentiality.** This is our best and final offer . . . .<br><br>(ECF No. 27-2, p. 4) (emphasis added). | |
| | **3:17 p.m. (From Investigator)**<br><br>I presented your new demands and [ACA] rejected and is making a "final" counter offer of:<br><br>[Redacted] in full and final settlement of the claim, subject to signing a settlement agreement with a release of all claims and confidentiality.<br><br>(ECF No. 27-2, p. 30). |
| | **3:44 p.m. (From Coman)**<br><br>**Yes, I accept the counter offer of [redacted] in full as final settlement of the claim, subject to signing a settlement agreement with a release of all claims and confidentiality. . . .**<br><br>(ECF No. 27-2, p. 29) (emphasis added). |
| **3:47 p.m. (From Investigator)**<br><br>[Coman] has accepted the counter offer of [redacted] in full and final settlement of his claim, subject to signing a settlement agreement with a release of all claims and confidentiality.<br><br>Will you be preparing the settlement | |

6

| | |
|---|---|
| agreement?<br><br>(ECF No. 27-2, p. 3). | |

Less than a week later, on February 3, 2021, ACA emailed the Investigator a "draft agreement for Mr. Coman to review and execute." (ECF No. 27-2, p. 2). The five-page draft agreement first stated its purpose: "[T]o forever resolve and settle any and all existing and potential disputes between the Parties regarding or arising out of Mr. Coman's employment with ACA, and any other disputes with ACA that Mr. Coman may have." (*Id.* at 16). It then set forth the specific terms of the agreement. First, the draft agreement declared that ACA promised to pay Coman a particular sum:

> 1. In consideration of the promises and other consideration described in this Agreement, ACA will deliver the gross sum of [redacted] (the "Payment") to Mr. Coman, which shall be in full and final settlement of all claims against ACA and the ACA Parties (as defined hereafter). ACA will make the Payment in the form of one check payable to Mr. Coman, which will be paid via IRS Form 1099. ACA shall deliver the Payment to Mr. Coman within 30 days of ACA's receipt of this Agreement, executed by Mr. Coman. . . .

(*Id.* at 16). Next, the draft agreement contemplated several promises by Coman with respect to taxes, indemnification, a general release of liability, confidentiality, and statements about ACA:

> 1. . . . It is understood and agreed that Mr. Coman shall be solely, individually and completely responsible for payment of all local, state and federal taxes owed by him, if any, as a result of any payments made pursuant to this Agreement. Mr. Coman further agrees to fully indemnify and defend ACA and the ACA Parties and hold them harmless from any claim for penalties, interest, unpaid taxes, or failure to withhold taxes related to the Payments made under this Agreement, and for all costs reasonably associated with defending any such claim. . . .
>
> 2. Mr. Coman agrees that in consideration of the receipt of the Payment, Mr. Coman will, and hereby does, forever and irrevocably release, hold harmless, and discharge ACA and its affiliates, and its and their officers, directors, members, employees, agents, predecessors·, successors, purchasers, assigns, representatives, and insurers (each, an "ACA Party" and collectively, the "ACA Parties"), of any and all grievances, claims, demands, debts, defenses, actions or causes of action, obligations,

> damages, and liabilities whatsoever that Mr. Coman now has, has had, or may have, whether the same be at law, in equity, or mixed, in any way arising from or relating to any act, occurrence, or transaction before the date Mr. Coman signed this Agreement. **This is a General Release.** Mr. Coman expressly acknowledges that this General Release includes, but is not limited to, Mr. Coman's intent to release the ACA Parties from any claim under contract, tort, defamation, misrepresentation, and wage and hour, as well as any claim of age, race, sex, religion, national origin or any other claim of employment discrimination . . . .
>
> . . .
>
> 4.  Mr. Coman agrees not to disclose any information regarding the existence or substance of this Agreement, except to Mr. Coman's spouse, tax advisor, and/or any attorney with whom Mr. Coman chooses to consult regarding Mr. Coman's consideration of this Agreement, or as otherwise specifically protected or required by law. . . .
>
> 5.  Mr. Coman agrees that in written or oral communications with any other person or entity, Mr. Coman will not disparage, make any derogatory or negative statements related to, or otherwise harm the reputation, good will, or commercial interests of ACA, its affiliates, and/or any of its or their officers, directors, or employees. ACA has a policy of forwarding professional reference requests that its employees receive to ACA's Human Resources department. ACA agrees that its Human Resources department will provide a neutral reference for Mr. Coman, which will include only the following information: (i) Mr. Coman's job title(s); and (ii) the dates of Mr. Coman's employment.

(*Id.* at 16–18). Beyond those promises, the draft agreement also required Coman to acknowledge that ACA denied any wrongdoing, that the draft agreement superseded any prior agreements, and that he had the opportunity to consult with an attorney:

> 6.  . . . ACA and the ACA Parties deny that they have violated any Federal or State or local statute, rule, ordinance, regulation or common law principle in its dealings with Mr. Coman and further deny that ACA or the ACA Parties have injured or wronged Mr. Coman in any way. Mr. Coman expressly acknowledges and agrees that, by entering into this Agreement, ACA and the ACA Parties in no way admit to any liability to Mr. Coman by reason of any matter. This Agreement is not, and shall not be construed as an admission by ACA, its employees, agents or representatives of any liability, responsibility, fault or wrongdoing.
>
> . . .

>    8.    . . . This Agreement contains the entire agreement and understanding between the Parties with respect to the subject matter of the Agreement, and there are no additional promises or terms among the Parties other than those contained herein.  This Agreement supersedes any and all prior agreements or understandings, written or oral, between the Parties pertaining to its subject, except that the confidentiality, non-competition, and non-solicitation provisions set forth in the Offer Letter signed by Mr. Coman when he accepted employment with ACA remain in effect. . . .
>
>    . . .
>
>    11.   Mr. Coman represents that Mr. Coman has read this Agreement, understands all of its terms, and enters into this Agreement voluntarily and with knowledge of its effect.  Mr. Coman acknowledges that ACA has advised Mr. Coman to consider seeking counsel from an attorney or representative of his choice about this Agreement, and that Mr. Coman has had ample opportunity to consult with an attorney or such representative concerning Mr. Coman's decision to enter into this Agreement and to have that attorney or representative review and explain to Mr. Coman the terms of this Agreement and its consequences. . . .

(*Id.* at 18–19).

Despite ACA having sent the investigator the draft agreement on February 3, 2021, she did not promptly forward it to Coman.  A few weeks went by, and on February 22, 2021, Coman emailed the investigator to express his frustration at not having heard anything since January 29.  He wrote, "It has been almost an entire month since I agreed to settle this matter and I have not had any kind of update.  Could you let me know where we stand?  I am ready to pursue further legal action if there is going to be any longer of a delay." (*Id.* at 29).  The investigator responded on February 25, 2021, apologizing for "g[etting] side tracked" and asking that Coman "review/sign and return" the draft agreement.  (*Id.* at 21).  When the investigator did not hear from Coman by March 10, 2021, she again asked him to "return the signed agreement." (*Id.*).

After reviewing the draft agreement, Coman found it to be "completely unacceptable." (ECF No. 27-1, ¶ 16).  He objected to, *inter alia*, the tax and indemnity provision, the general

9

release, the non-disparagement provision (including the offer of only a neutral reference), and ACA's denial of liability. (*Id.* ¶¶ 17–37). In short, Coman felt that ACA "had included terms and conditions that were not discussed nor even contemplated in [their] preliminary negotiations." (*Id.* ¶ 37). Coman thus retained counsel on March 11, 2021, and, thereafter, instructed his counsel to withdraw from settlement negotiations and pursue his case in court. (*Id.* ¶ 38; ECF No. 28, p. 1). Coman's counsel emailed the investigator on March 15, 2021. He stated that Coman wished to "terminate settlement negotiations" and requested that the EEOC issue a Notice of Right to Sue ("NRTS"). (ECF No. 26-1, p. 22). The NRTS issued the next day, March 16, 2021, and the investigator emailed a copy to Coman's counsel. (*Id.* at 26–28). Coman then timely filed suit in the Court of Common Pleas of Allegheny County, Pennsylvania, and ACA ultimately removed the case to this Court. (ECF No. 1).

## II. STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

### III.  ANALYSIS

ACA contends that it is entitled to summary judgment because the parties previously reached a settlement agreement, pursuant to which Coman released all claims against ACA. (ECF No. 25, p. 5).  Specifically, ACA argues that an enforceable contract was formed on January 29, 2021, when ACA made an offer (*e.g.*, "I have obtained authority to meet [Coman] in the middle, and pay [redacted] in full and final settlement of his claim, subject to signing a settlement agreement with a release of all claims and confidentiality."), and Coman accepted that offer (*e.g.*, "Yes, I accept the counter offer of [redacted] in full as final settlement of the claim, subject to signing a settlement agreement with a release of all claims and confidentiality."). (*Id.* at 8; ECF No. 27-2, pp. 4, 29).  ACA maintains that the parties "agreed to all essential terms to form an agreement"—including "a monetary amount to settle, a release of all claims, and confidentiality"—and that it is "irrelevant" that such an agreement "has not yet been reduced to a formalized writing." (ECF No. 25, p. 6; ECF No. 30, p. 2).  ACA thus asks the Court to enforce the parties' "binding agreement" and not permit Coman to "arbitrarily renege." (ECF No. 25, p. 6; ECF No. 30, p. 1).

Coman counters that an "enforceable agreement was never reached." (ECF No. 29, p. 2). He claims that "the settlement negotiations that went through the EEOC were informal and sloppy at best." (*Id.* at 1).  According to Coman, "both parties were aware there were a lot of issues that had not yet been addressed," which is "why each side conditioned the settlement upon signing a release." (*Id.* at 2).  Coman maintains that the signing of a written settlement agreement was a "condition precedent" to contract formation. (*Id.* at 8).  He further argues that "there was no requisite meeting of the minds" during the email exchange, as the parties did not discuss several "material terms" that were later included (by ACA) in the draft agreement—

including "taxes, indemnification, non-disparagement, employment references, non-solicitation, waiver of rescission due to misrepresentation, and non-compete clauses." (*Id.* at 2, 5). As such, Coman argues that ACA cannot establish that a contract was ever formed.

Upon careful review of the record evidence, and for the reasons below, the Court holds that a reasonable jury could find that ACA and Coman never created an enforceable settlement agreement. The Court will, therefore, deny ACA's Motion for Summary Judgment. *See Anderson*, 477 U.S. at 248 ("[S]ummary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The enforceability of a settlement agreement turns on state contract law. *See Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir. 2006); *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999) ("To be enforceable, a settlement agreement must possess all of the elements of a valid contract."). Under Pennsylvania law,[3] a contract is enforceable if (1) the parties have manifested an intent to be bound by the agreement, (2) the terms of the agreement are sufficiently definite, and (3) the agreement is supported by consideration. *See Johnston the Florist, Inc. v. Tedco Constr. Corp.*, 657 A.2d 511, 516 (Pa. Super. 1995); *see also Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) ("Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced. Additionally, of course, there must be consideration on both sides." (internal citations omitted)).

---

[3] With respect to the enforceability of the alleged settlement agreement, the parties both cite to Pennsylvania law. (ECF No. 25, p. 5; ECF No. 29, p. 8). The Court will, therefore, apply Pennsylvania contract law by consent of the parties. *See, e.g., Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 n.4 (3d Cir. 2009) (applying Pennsylvania law to determine enforceability of settlement agreement where "[b]oth parties concede that Pennsylvania law applies"); *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986) (honoring parties' agreement that "Pennsylvania law applies" to question of contract enforceability).

Only the first two elements are contested in this case. However, the Court need only address the first to resolve ACA's motion.

Whether parties intend to be bound by a contract is a question of fact. *See Mazzella*, 739 A.2d at 536 ("[T]he parties' intent is a question to be resolved by the finder of fact."); *Bethlehem Steel Corp. v. Litton Indus., Inc.*, 468 A.2d 748, 751 (Pa. Super. 1983) ("The 'intent to contract' is a question of fact for the trier-of-fact."); *see also Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 200 (3d Cir. 2012) (noting that, under Pennsylvania law, the question whether "both parties have manifested an intention to be bound" is "factual in nature"). The inquiry, moreover, is objective. "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. 1984); *see also Long v. Brown*, 582 A.2d 359, 363 (Pa. Super. 1990) ("[O]bjective manifestation is the governing factor, regardless of subjective beliefs and reservations."). Accordingly, while "there must be manifested mutual assent to the terms of a bargain," *Mazzella*, 739 A.2d at 536–37, a "true and actual meeting of the minds is not necessary to form a contract," *Ingrassia*, 486 A.2d at 482.

To determine whether the parties manifested an intention to be bound by a contract, a finder of fact must look to their words and actions as well as the surrounding circumstances. *See Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 584 (3d Cir. 2009); *Channel Home Ctrs.*, 795 F.2d at 299. The presence or absence of a signed writing is relevant, but not dispositive. In Pennsylvania, "parties may bind themselves contractually prior to the execution of a written document through mutual manifestations of assent, even where a later formal document is contemplated." *Krause v. Great Lakes Holdings, Inc.*, 563 A.2d 1182, 1185 (Pa.

13

Super. 1989) (citing *George W. Kistler, Inc. v. O'Brien*, 347 A.2d 311, 315 (Pa. 1975); *Field v. Golden Triangle Broad., Inc.*, 305 A.2d 689, 693 (Pa. 1973)). In other words, "[w]here the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Mazzella*, 739 A.2d at 536. However, "[i]f a party wishes to withhold his assent upon the condition that a contract be signed, it is surely within his province to do so." *Ingrassia*, 486 A.2d at 483. Under those circumstances—i.e., "where the parties contemplate that their agreement cannot be considered complete before it is reduced to writing"—"no contract exists until the execution of the writing." *Krause*, 563 A.2d at 1186 (citing *Essner v. Shoemaker*, 143 A.2d 364, 366 (Pa. 1958)).

Here, the parties dispute whether they intended to be bound via their email communications and to later formalize their agreement in a signed writing (ACA's position), or whether they intended to be bound only when they signed a written agreement (Coman's position). Viewing the evidence in the light most favorable to Coman, the Court holds that a jury could find in favor of Coman on this material question of fact. The analysis begins with consideration of the surrounding circumstances. The parties engaged in "informal and sloppy" settlement negotiations via email, filtered through an intermediary. (ECF No. 29, p. 1). Though ACA may contest such a characterization of the negotiations, it is certainly supported by the record, which reveals that the investigator frequently failed to fully and promptly communicate one party's message to the other. A reasonable jury could infer that such breakdowns in communication prevented the parties from mutually assenting to be bound by contract. Nevertheless, at the time of the emails, the parties may not yet have been aware of (*i.e.*, seen outward manifestations of) the true extent of the investigator's poor handling of the negotiations.

The analysis thus turns to the parties' own words and actions. Most importantly, both Coman and ACA expressly qualified their offer and acceptance as being "subject to signing a settlement agreement with a release of all claims and confidentiality." (ECF No. 27-2, pp. 4, 29). A jury could find that this language indicates that neither party intended to be bound by their emails, but rather intended to be bound only upon the signing of a written settlement agreement. That finding is bolstered by the parties' subsequent actions. ACA did not make any attempt to pay Coman following his email acceptance, nor did Coman seek such payment. Instead, both parties waited to perform their obligations (or seek performance) until a written agreement was signed. Indeed, ACA's draft agreement stated that ACA would not deliver payment to Coman until it received the signed agreement. (ECF No. 27-2, p. 16) ("ACA shall deliver the Payment to Mr. Coman within 30 days of ACA's receipt of this Agreement, executed by Mr. Coman."). Moreover, it is apparent that Coman did not consider the matter resolved absent a signed settlement agreement, as he threatened to "pursue further legal action" when he never received a copy of the draft agreement from the investigator. (*Id.* at 29).

For those reasons, a reasonable jury could find that ACA and Coman did not manifest an intention to be bound by their email communications, and, thus, that the parties did not form an enforceable settlement agreement. *See Mazzella*, 739 A.2d at 536–37 ("[B]efore preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain."). Since a jury could find in favor of Coman on this issue, ACA is not entitled to summary judgment.[4]

---

[4] To be clear, ACA remains free to raise the alleged settlement agreement as an affirmative defense should the case proceed to trial.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny ACA's Motion for Summary Judgment (ECF No. 24). An Order of Court will follow.

BY THE COURT:

*/s/ William S. Stickman IV*
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:

7/27/22